**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JERRY HOLMAN, | Case No.: 2:21-cv-00266-APG-NJK |
| Petitioner | **Order Denying Petition, Denying Certificate of Appealability, and Closing Case** |
| v. | |
| CALVIN JOHSON,[1] *et al*., | |
| Respondents | |

In his 28 U.S.C. § 2254 petition for a writ of habeas corpus Jerry Holman challenges his murder conviction, arguing that his trial and appellate counsel were ineffective and that insufficient evidence supported the verdict. ECF No. 44.  Because I conclude that his claims lack merit, I deny the petition, deny a certificate of appealability, and close the case.

**I.      Background**

In August, 2015, an Eighth Judicial District Court (Clark County, Nevada) jury convicted Holman of conspiracy to commit murder and first-degree murder with use of a deadly weapon. ECF No. 23-5.  The charges stemmed from an incident where Holman and his girlfriend, Mariah Whitemagpie, argued with the victim at an apartment complex in Las Vegas.  Cellphone video showed the victim backing away from the two as they pursued him.  Holman then stabbed him repeatedly.  The victim was pronounced dead at the hospital.  Holman was sentenced to life in prison without the possibility of parole. ECF No. 23-8.  Judgment of conviction was entered on

---

[1] According to the state corrections department's inmate locator page, Holman is incarcerated at High Desert State Prison.  The department's website reflects Jeremy Bean is the warden for that facility.  At the end of this order, the court directs the Clerk to substitute Jeremy Bean for the prior respondent Calvin Johnson, under, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

October 29, 2015. ECF No. 23-9.  The Supreme Court of Nevada affirmed his conviction and affirmed the denial of his state habeas corpus petition. ECF Nos. 24-5, 26-4.

Holman dispatched his federal habeas petition for filing in February 2021. ECF No. 1-1.  I granted his motion for appointment of counsel. ECF No. 33.  He filed a counseled, second-amended petition asserting the following three grounds for relief:

> Ground I: Holman received ineffective assistance of counsel:
>
> > A.  Trial counsel made multiple procedural errors during Ronald Acuna's testimony;
> > B.  Trial counsel failed to object to burden-shifting by the prosecutor; and
> > C.  Trial counsel's deficient performance prejudiced Holman.
>
> Ground II: Holman's appellate counsel was ineffective for failing to argue that the prosecution improperly impeached a defense witness.
>
> Ground III: Holman was convicted based on insufficient evidence in violation of his due process rights.

ECF No. 44 at 7-17.

**II.     Trial Testimony**

I summarize the trial evidence and related state court record material and proceedings as a backdrop to my consideration of the issues presented in the case.[2]

Tymarcus Standmore lived at a Las Vegas apartment complex with his girlfriend Johnika Younger in August 2014. ECF No. 201- at 65-105.[3]  His cousin Rodney Hadley also lived in the

---

[2] I make no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record.  I summarize them only as background to the issues presented in this case, and I do not summarize all such material.  No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by me.  Any absence of mention of a specific piece of evidence or category of evidence does not signify that I overlooked it in considering Holman's claims.

[3] *See also*, ECF No. 20-1 at 106-127, testimony of Johnika Younger; ECF No. 21-1 at 48-66, testimony of Rodney Hadley; ECF No. 20-1 at 127-136, testimony of neighbor Felecia Gilbert.

complex. On Sunday, August 17, 2014, they were all hanging out when one of Hadley's daughters ran in from outside and said that someone was looking for a lost girl. Hadley went outside and two males and a female showed him a cellphone picture of a female who they called Sharon or Shannon; he didn't recognize the person. The larger man was wearing blue jeans and a large white t-shirt; the second man was smaller and was wearing a white tank top. Standmore, Younger, and Hadley identified the person in the white tank top in court as Holman. The woman had a feather tattoo under her left eye. Hadley and Standmore went back into Hadley's apartment. Holman—apparently unconvinced that Hadley didn't know the whereabouts of the woman he was looking for—stuck his head in the door and looked around.

Standmore and Younger left briefly by car, and when they returned, the three individuals were still at the complex. The victim, Nigel Hewitt II, was interacting with them, and they looked to be having some kind of heated argument. Younger had seen Hewitt around the complex in the past walking his dog or carrying groceries. Holman and his group were the "aggressive parties" in the conversation; Holman and the woman, later identified as Whitemagpie, appeared angry or agitated. ECF No. 20-1 at 112. It looked like there was going to be a fight so Younger headed towards kids who were out playing to get them inside. Whitemagpie was talking to Hewitt; Holman paced back and forth behind them. Holman began arguing with Hewitt; Standmore filmed on his phone. Holman pull out a knife; he fumbled it and picked it up again. Hewitt started running toward his house; he slipped and Holman jumped on him. Standmore thought that Holman was punching Hewitt. Younger said Hewitt fell as he was backing up with his hands up and Holman climbed on top of him. She initially thought Holman was punching Hewitt but then she could see that he was actually stabbing Hewitt.[4] Holman got

---

[4] *See also*, ECF No. 21-1 at 69, LVMPD crime scene analyst Jessie Sams testified that she saw the victim at the hospital and he had apparent stab wounds.

up and he, Whitemagpie, and the other male began quickly walking away and then broke into a run. Standmore got a clear look at Holman during the course of events; while Holman's back is to the cellphone video, Standmore testified that it was Holman in the video. Standmore quickly identified both Holman and Whitemagpie in police photo lineups. ECF No. 22-1 at 17-63 (testimony of Las Vegas Metropolitan Police Department (LVMPD) detective Martin Wildemann).

The video, introduced at trial, is shaky, but shows a man wearing red shorts and no shirt. *See* ECF No. 76. He's backing up as a man in a white tank top drops something on the ground and picks it up. A woman is following behind the man in the tank top. The two pursue the man in the red shorts as he continues to back up across the street. It sounds like they are talking aggressively to the man in the shorts. It then appears that Standmore ducked behind a wall; the video only shows the wall, and heavy breathing can be heard. No one's face can be seen clearly.

Francesco Martynes saw a man and a woman walking quickly down the street, looking over their shoulders, looking ready to break into a run. ECF No. 21-1 at 11-13. The man had no shirt on. The woman took something white out from under her clothes and threw it under a parked car.

Earlier Nigel Hewitt, Sr., the victim's father, had encountered Holman. ECF No. 21-1 at 22-48. Mr. Hewitt knew of a young Native American woman named Shannon Lee who lived in the neighborhood. That day he was walking through the apartment complex and he saw a Native American woman with a feather tattoo on her face walking around knocking on doors. He identified Holman in court, noting that he had a small tattoo by his left eye. They were with a second male who was heavier. By their body language all three looked angry. Holman asked

Mr. Hewitt if he knew a small young Native American woman named Shannon. Mr. Hewitt told them that he'd seen Shannon a couple of days ago. Mr. Hewitt went to his apartment. His son then left the apartment to go to the store. Not long after a friend called Mr. Hewitt and said that someone was chasing after his son. Mr. Hewitt ran outside and found his son slumped down against the wall by the door. There was a lot of blood. Someone pointed in the direction that the perpetrators fled. Mr. Hewitt ran a short way and didn't see anyone, so he returned to his son. Later he and some friends saw Shannon drive by; they gave chase but couldn't find her.

The defense called Davis Holman, Holman's brother. ECF No. 22-1 at 82-121. Davis testified that the day of the stabbing there was a barbecue at his mother's house. He said he and several of his friends, along with Holman and his girlfriend, were at the barbecue at the time of the murder. Holman's mother Maria testified that when she arrived home that evening (which was after the time of the murder), Holman and a woman were watching TV in his room and Davis was outside with four friends. ECF No. 22-1 at 122-148.

**III.    Legal Standards & Analysis**

**a.  AEDPA Standard of Review**

The Antiterrorism and Effective Death Penalty Act (AEDPA) sets forth the standard of review generally applicable in habeas corpus cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

5

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254 "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

To the extent that the petitioner challenges the state court's factual findings, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review.

*See, e.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a mere showing that the state court finding was "clearly erroneous." *Lambert*, 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### b.  Direct Appeal Claim—Sufficiency of the Evidence

**Ground III**

Holman argues that insufficient evidence was presented at trial to prove beyond a reasonable doubt that he was the killer. ECF No. 44 at 14-17; ECF No. 70 at 18-21. Cellphone video did not show the perpetrator's face clearly. While several people identified Holman as one of the three individuals asking around for Lee, only Standmore and Young testified that they saw Holman punch or stab the victim. Holman argues that Younger was 50 or 60 feet away and that from Standmore's cellphone video it appears that he had ducked behind a wall at the time of the actual stabbing. DNA from the torn white shirt with blood on it matched the victim, and Holman was excluded as a contributor. The knife found in Holman's bathroom was never tied to the stabbing, and no DNA was recovered from it.

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re*

*Winship*, 397 U.S. 358 (1970)).  On federal habeas corpus review of a judgment of conviction pursuant to § 2254, the petitioner is entitled to relief if, based on the evidence presented, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*. at 324. "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16.  On habeas review, this court must assume that the trier of fact resolved any evidentiary conflicts in favor of the prosecution and must defer to such resolution. *Id*. at 326.  When federal courts "assess a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011).  First, the *Jackson* standard is itself deferential. *Id*.  Second, the state court's determination of sufficiency of evidence claims is entitled to deference. *Id*. at 964-965.  Generally, the credibility of witnesses is beyond the scope of a review of the sufficiency of the evidence. *Schlup v. Delo*, 513 U.S. 298, 330 (1995).

The Supreme Court of Nevada held that sufficient evidence had been presented:

> Appellant Jerry Holman was arrested and charged for the stabbing of Nigel Hewitt II, based on eye-witness accounts and cell-phone video that put him at the scene.  During their investigation, detectives recovered a white tank top near the scene, which witnesses testified Holman was wearing, and a knife in Holman's home.  A DNA examiner testified at trial that Holman's DNA was not found on these items.  Also at trial, the district court admitted 40 autopsy photos during the medical examiner's testimony.  Holman was found guilty and now appeals his conviction.

> Holman argues there was insufficient evidence to find him guilty of first-degree murder because the knife and tank top lacked conclusive DNA, and the cell-phone video lacked a clear picture.  We disagree.  Holman does not claim that the State failed to present sufficient evidence of any element of the offense, but rather challenges the quality of the evidence produced at trial.  Questions regarding the weight to be assigned to the evidence, and the inferences to be drawn, however, are reserved to the jury. *Adler v. State*, 95 Nev. 339, 344, 594 P.2d 725, 729 (1979).

8

Additionally, a review of the record on appeal reveals sufficient evidence, as a whole, to establish guilt beyond a reasonable doubt, as determined by any rational trier of fact viewing the evidence in the light most favorable to the State. *See Brass v. State*, 128 Nev. 748, 754, 291 P.3d 145, 149-50 (2012); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Notably, there was no objection below to the introduction of the knife, tank top, or cell-phone video and video stills. While Holman's DNA was not found on the knife or tank top, the knife was found in Holman's apartment and there was testimony that Holman was wearing the tank top. The DNA examiner testified as to why Holman's DNA may not have been found on either item, and the jury was free to consider her testimony and evaluate her credibility. *See Clancy v. State*, 129 Nev. 840, 848, 313 P.3d 226, 231 (2013) ("This court will not reweigh the evidence or evaluate the credibility of witnesses because that is the responsibility of the trier of fact." (internal quotation marks omitted)). Moreover, the eyewitness who recorded the altercation testified it was Holman in the cellphone video, which was played for the jury. As such, we conclude there is substantial evidence to support the jury's verdict.

ECF No. 24-5 at 2-4.

Jessica Acevedo, LVMPD forensic scientist in the biology DNA detail, testified that the DNA profile she compared with the DNA swabs she recovered from the victim's hands were consistent with the victim; Holman was excluded as a possible contributor. ECF No. 21-1 at 97-142. She was unable to develop a DNA profile from the folding knife found in Holman's apartment.[5] The DNA obtained from a swab of the exterior of the knife handle was consistent with originating from a single male contributor.

A LVMPD crime scene analyst recovered a balled-up white tank top at the scene by the side of the road.[6] Acevedo tested staining on the tank top, which was positive for blood. She recovered a partial DNA profile from that test, which was consistent with the victim and excluded Holman as a possible contributor. She obtained a full profile from a different stain,

---

[5] LVMPD crime scene analyst Kristen Meckler testified that a knife was recovered from the bathroom of Holman's apartment. ECF No. 21-1 at 73-98. A bottle of nail polish remover was next to it.

[6] ECF No. 20-1 at 62-63, testimony of Caitlin Toeppen-King.

which was also consistent with the victim and excluded Holman.  Acevedo explained that blood is a "rich source" of DNA. *Id*. at 126.  She swabbed the whole inside of the tank top, and the DNA profile obtained showed an indistinguishable mixture of at least three individuals with at least one being male.  Acevedo explained that she could not reach any further conclusions because there was too much DNA.  She described clothing as a "mixed bag," sometimes she gets a great profile, sometimes she doesn't get anything, and sometimes she gets too much DNA. *Id*. at 123-124.  She explained that sweat does not contain DNA but that sometimes she can obtain profiles from skin cells in the salt and water of sweat.

Eyewitnesses testified that Holman—who they identified in court and photo lineups—was wearing a white tank top.  They said he brandished a knife, dropped it then picked it up.  He pursued Hewitt, jumped on top of him and stabbed him repeatedly.  Witnesses saw a man and woman walking quickly from the scene.  The man was shirtless and witnesses saw the woman take a white bundle out from under her shirt and throw it under a car.  Hewitt's DNA was found in blood stains on that top.  A folding knife was recovered from Holman's home.  The video does not show the perpetrator's face.  But the events the video shows are entirely consistent with the testimony of eyewitnesses who also said that it was Holman who was wearing the white tank top and who stabbed Hewitt.

Holman has not shown that insufficient evidence supported the verdict; he has not demonstrated that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  The Supreme Court of Nevada's decision on federal ground III was a reasonable application of *Strickland*. 28 U.S.C. § 2254(d).  I therefore deny federal habeas relief on ground III.

/ / / /

10

**c.  Ineffective Assistance of Counsel Claims**

Holman also argues that his trial and appellate counsel rendered ineffective assistance of counsel (IAC).  IAC claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  A petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687).  To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*.  To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*.  A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*.  Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689.  It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.  Counsel's performance is "measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may grant relief only if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

Federal review of a state supreme court's decision on a claim of ineffective assistance of counsel is "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  The reviewing court must "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations omitted).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105.  Federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-184.  "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689).  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id*. (internal quotations and citations omitted).

**Ground I(A)—Ronald Acuna's testimony**

Holman contends in ground I(A) that trial counsel was ineffective for failing to object to investigator Acuna's testimony on the bases that it was hearsay and that it violated the Confrontation Clause. ECF No. 44 at 7-9.  Acuna, an investigator for the Clark County District Attorney, testified that he had located Shannon Lee in Idaho. ECF No. 22-1 at 63-69.  In response to the prosecutor's question, he said Lee was unwilling to return to Las Vegas.  She told

12

Acuna that she went with Holman to Las Vegas in the summer of 2014 and that she lived there in his mother's apartment with him. Acuna had asked her if Holman was upset with her at the time of the murder, and she said she had heard that he was and thought it was because she owed him $5.00. She knew of the murder but had not been there. After she was in contact with the victim's father, she returned to Idaho because she was scared. On cross-examination, defense counsel asked Acuna why he believed Lee would not return to Las Vegas. Acuna indicated that Lee was afraid. Counsel asked: "Did she indicate who she was afraid of?" and Acuna responded: "Yes, your client." *Id*. at 68-69.

Holman argues that his counsel was deficient and he was prejudiced. ECF No. 44 at 9. He contends that the $5.00 was an alleged motive in the homicide and that testimony that Lee was afraid of Holman was very damaging as it painted him as dangerous and perhaps violent. He asserts that whether he had a motive and was violent were critical because no physical evidence linked him to the murder and there was reason to doubt the accuracy of eyewitnesses.

Defense counsel Jason Margolis testified at Holman's state postconviction habeas corpus evidentiary hearing. ECF No. 25-5 at 5-16. He said it was a tactical decision not to object to Acuna's statement about the $5.00 because the defense didn't think the testimony was particularly probative or damaging. In counsel's opinion the jury would not have appreciated repeated objections. Margolis acknowledged that he elicited Acuna's testimony that Lee said she was afraid of Holman. Counsel stated:

> It was a mistake. I made a mistake. I asked a poor question. It's a mistake I won't make again, and I learned from it immediately. That being said, I don't feel that our client endured prejudice on account of that mistake, but I will admit wholeheartedly that that was a mistake and not my finest hour as trial lawyer.

13

*Id.* at 8. Margolis noted on cross-examination that Lee was not present at the murder and that several witnesses also testified that Holman was angry and was looking for Lee.

The Supreme Court of Nevada rejected the claim, holding that Holman did not show deficiency nor prejudice:

> First, appellant argues that trial counsel should have objected when the State's investigator testified to S. Lee's out-of-court statements that she came to Las Vegas with appellant and thought appellant was mad because she owed him $5. Appellant argues that this testimony was hearsay and violated his right to confrontation. Appellant has not demonstrated deficient performance. Appellant's trial counsel testified that he decided not to object every time the opportunity presented itself because it could alienate the jury and that he believed the information was not harmful. Strategic decisions are virtually unchallengeable absent extraordinary circumstances, *Strickland*, 466 U.S. at 690-91, and appellant has not demonstrated any such circumstances here. Appellant has further not demonstrated that there was a reasonable likelihood of a different outcome at trial had counsel objected in light of the overwhelming evidence of guilt, which included eyewitness testimony (including descriptions of appellant's aggressive and angry conduct at the apartment complex) and video. Therefore, the district court did not err in denying this claim.[FN1]

> Next, appellant argues that trial counsel elicited highly prejudicial hearsay testimony from the State's investigator when trial counsel asked who S. Lee was afraid of and the investigator responded that S. Lee told him that she was afraid of appellant. Trial counsel testified that he should not have asked the question, but he did not feel appellant was prejudiced by the mistake. Even if trial counsel was deficient in eliciting this testimony, we conclude that appellant has not demonstrated a reasonable probability of a different outcome had trial counsel not asked the question in light of the overwhelming evidence of guilt. Therefore, we conclude that the district court did not err in denying this claim.[FN2]

> [FN1: Additionally, appellant has not demonstrated that appellate counsel was deficient in failing to raise this issue on appeal or that this issue would have had a reasonable likelihood of success on appeal.]

> [FN2: Same as FN1.]

ECF No. 26-4 at 3-4.

Holman has not shown that the Supreme Court of Nevada's decision on federal ground I(A) was contrary to, or involved an unreasonable application of, *Strickland*. Defense counsel's

14

tactical decision not to object to Acuna's testimony in an effort to keep objections to a minimum was not unreasonable. Acuna's testimony that Lee thought Holman was upset with her over $5.00 did not add anything new of real significance to the State's case. Multiple witnesses had testified that Holman, Whitemagpie, and another male were going door-to-door in the apartment complex looking for Lee and that they appeared agitated and aggressive. Even assuming that defense counsel was deficient when he elicited the testimony that Lee was afraid of Holman, it cannot have caused prejudice. Lee was not present at the murder, and her indication that she was afraid of Holman much later is not probative to the identity of Hewitt's murderer. Several witnesses identified Holman as the young man in a white tank top who was asking around for Lee. Two witnesses identified Holman as the young man in a white tank top who took out a knife, dropped it and picked it back up, pursued Hewitt and then stabbed him multiple times. While no physical evidence conclusively linked Holman to the murder, witnesses saw a shirtless man hurrying from the scene with a woman who took a white bundle out from under her shirt and threw it under a car. The bundle turned out to be a white tank top stained with Hewitt's blood. And a folding knife was recovered from Holman's bathroom, near a bottle of nail polish remover. Holman has not demonstrated deficiency or prejudice, so I deny federal habeas relief on ground I(A).

**Ground I(B)—burden-shifting by the prosecutor**

Holman argues that his counsel was ineffective for failing to object when the prosecution sought to shift the burden of proof to the defense during cross-examination of his brother Davis and in closing arguments. ECF No. 44 at 9-11. He asserts that the prosecution improperly suggested the defense had to produce certain witnesses or explain why they weren't called to

15

testify. He insists that the evidence against him was limited to two "questionable" witnesses, and therefore, the jury's verdict likely was influenced by the improper burden shifting. *Id*. at 11.

A prosecutor's improper comments will violate the Constitution only if they "'so infect[] a trial with unfairness'" as to render the conviction a denial of due process. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (reaffirming that *Darden* is the established federal law relating to a prosecutor's improper comments). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). It is not enough that a prosecutor's comments are "undesirable or universally condemned," the relevant question is still whether the comments infected the trial with unfairness to make the conviction a denial of due process. *Darden*, 477 U.S. at 181-82.

"[A] prosecutor's comment on a defendant's failure to call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify." *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000); *see also United States v. Vaandering*, 50 F.3d 696, 701-02 (9th Cir. 1995) (holding that a prosecutor's comments highlighting the weaknesses in the defendant's case did not shift the burden of proof because the prosecutor did not comment on the defendant's failure to testify, and expressly told the jury that the government bore the burden of proof). In Nevada, the prosecution may ask questions "relating to the veracity of the witnesses . . . in an attempt to rebut [the defendant's] theory of the case." *Pascua v. State*, 145 P.3d 1031, 1035 (Nev. 2006).

16

Davis testified that he was at home at a family barbecue at the time of the murder. ECF No. 22-1 at 82-121. He said Holman and Whitemagpie were there. Davis named several of his friends that he said were also present. He said that the barbecue started around 4 or 4:30 p.m. and that about 7:00 p.m. he left to go to the store for sodas. He said he was walking with two friends when two uniformed Metro officers stopped him. A detective then arrived and questioned him. Davis identified detective Wildemann from a photo his counsel showed him as that detective. Davis said that the officers questioned him because he fit the description of someone they were looking for; he was wearing jeans and a white shirt with spaghetti sauce spilled on it, which police thought was blood.[7] At some point his mother came running up. After speaking with Davis's mother, the detective left.

The prosecution questioned Davis as to why none of the friends who were at the barbecue testified; Davis noted that one friend didn't want to testify because "she didn't want nothing to do with this." *Id*. at 95. Davis said he didn't know how to get in touch with one of the friends, and that another one had since died. He didn't know one friend's last name, and he never gave anyone that friend's address. Davis acknowledged that he never went to the detectives to tell them that Holman was with him the entire time. He agreed that Holman had returned to Las Vegas from Idaho that summer. While Acuna said Lee told her she'd lived with Holman in his mother's apartment that summer, Davis denied knowing Lee.

The prosecution recalled detective Wildemann. *Id*. at 148-158. The detective explained that dispatch records in Computer Assist Dispatch (CAD) all events or actions that transpire, including car stops, transport of a victim to the hospital or the identification of a witness. Every

---

[7] Maria Holman testified that she had made Davis spaghetti. ECF No. 22-1 at 122-148.

incident gets an event number, and all actions related to that incident are recorded in CAD under that event number.  Wildemann reviewed the CAD under the event number for Hewitt's murder and found was no indication that police ever stopped Davis Holman in relation to the investigation.  Wildemann said he never personally stopped and questioned Davis.  He had no recollection of speaking with a young man with spaghetti sauce on his shirt the day of the murder.  On direct he had noted that if any officers had come into contact with a suspect, dispatch would have called him. ECF No. 22-1 at 17-63.

During closing arguments the prosecutor questioned Davis's version of events:

> Now, I would submit to you that there are definitely some big – big holes in Davis's story yesterday.  He admitted, as did defendant's mom, that no one ever called the police and tried to tell the police, oh, no, Jerry wasn't at the scene of the crime, Jerry was with us.  Or mom wasn't even with Jerry at the time of the crime, she came along after.  But Davis never tried to tell anybody that he was with Jerry at the time.
>
> Additionally, obviously, Davis has his own problems going on with the system and he probably has some animosity towards the State and he obviously has a very big interest in Jerry not being found guilty here today.  So that alone is a serious motive that's contrary to him being truthful in this case.  So the State would submit that you can disregard Davis's testimony.

ECF No. 23-2 at 8-9.  The prosecutor also told the jury that they had to decide if the State proved beyond a reasonable doubt that the defendant committed a crime and what precise crimes he committed. *Id*. at 8.

Defense counsel Margolis testified at Davis's state postconviction evidentiary hearing that he recalled that the prosecutor questioned Davis regarding the whereabouts of other potential alibi witnesses—that is, Davis's friends that also saw Holman at home at the time the crime occurred. ECF No. 25-5 at 10-11.  Margolis testified that during trial he thought that the prosecutor was "browbeating our alibi witness without much discernible effect," so the defense

18

chose not to object on the basis of burden-shifting. *Id*. at 11.  At the time Margolis didn't think it appeared that the prosecution's tactic was resonating with the jury.  But if he had it to do over again, he would have raised this issue on appeal.  As to Davis's credibility, Margolis said "I knew that there were some problems with our alibi testimony, and we tried to shore it up by calling additional witnesses that could serve as partial alibis, including the defendant's mother, but it wasn't as effective as we'd hoped." *Id*. at 15.  Margolis testified that he did not believe that arguing that the prosecutor improperly shifted the burden would have made a difference on appeal.

Similarly, the Supreme Court of Nevada concluded that Holman failed to show a reasonable possibility of a different outcome:

> Next, appellant argues that trial counsel should have objected to the State shifting the burden of proof when asking the alibi witness, appellant's brother, questions about other people at the barbeque and why he did not come forward earlier.  Appellant also argues that trial counsel should have objected to the State referencing big holes in the alibi witness's testimony.  Appellant has not demonstrated deficient performance.  The prosecutor's questions did not shift the burden of proof; rather, they probed the witness's credibility by examining his ability to recall details and explain actions he did or did not take when his brother was arrested for murder. *See Pascua v. State*, 122 Nev. 1001, 1007-08, 145 P.3d 1031, 1035 (2006) (recognizing that a prosecutor may ask questions related to the veracity of witnesses to rebut the defense theory of the case); *Lobato v. State*, 120 Nev. 512, 518, 96 P.3d 765, 770 (2004) (recognizing that impeachment includes challenges to "the competence of a witness to testify, i.e., attacks based upon defects of perception, memory, communication and ability to understand the oath to testify truthfully" and "ulterior motives for testifying).  The prosecutor's closing argument did not shift the burden of proof but commented on the evidence and the defense theory of the case. *See Jimenez v. State*, 106 Nev. 769, 772, 801 P.2d 1366, 1367-38 (1990) ("[P]rosecutors must be free to express their perceptions of the record evidence and inferences properly drawn therefrom."); *Evans v. State*, 117 Nev. 609, 631, 28 P.3d 498, 513 (2001) (recognizing that it is not improper for the prosecutor "to comment on the failure of the defense to counter or explain evidence presented"), overruled on other grounds by *Lisle v. State*, 131 Nev. 356, 366 n.5, 351 P.3d 725, 732 n.5 (2015).  Appellant further has not demonstrated a reasonable probability of a different outcome in light of the overwhelming evidence of guilt.  Therefore, we conclude that the district court did not err in denying this claim.[FN3]

[FN3: Additionally, appellant has not demonstrated that appellate counsel was deficient in not raising this issue or that it would have had a reasonable likelihood of success on appeal, and thus, he has not demonstrated appellate counsel was ineffective in this regard.]

ECF No. 26-4 at 4-5.

Holman has not demonstrated that the Supreme Court of Nevada's conclusion was contrary to, or involved an unreasonable application of, *Strickland* or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). So I deny ground I(B). And even if I were to assume that the prosecution engaged in inappropriate burden-shifting, Holman cannot show prejudice in light of the overwhelming evidence against him—including eyewitness testimony, the video, the discarded shirt, and his relationships with Whitemagpie and Lee.

**Ground I(C)—cumulative effect of ineffective counsel**

Holman argues that he suffered prejudice from the cumulative effect of trial counsel's errors as alleged in grounds I(A) and I(B). ECF No. 44 at 11-12. The Ninth Circuit has held that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007), citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973). The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. *Chambers*, 410 U.S. at 290 n.3. The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense "far less persuasive," and thereby had a "substantial and injurious effect or influence" on the jury's

20

verdict. *Parle*, 505 F.3d at 928 (citing *Chambers*, 410 U.S. at 294); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

The Supreme Court of Nevada rejected this claim:

> Finally, appellant argues that any deficiencies in counsel's performance should be cumulated for purposes of determining prejudice. Even assuming multiple instances of deficient performance could be cumulated for purposes of demonstrating prejudice, *see McConnell v. State*, 125 Nev. 243, 259, 212 P.3d 307, 318 (2009), appellant has demonstrated only one instance of trial counsel's deficient performance and one instance of appellate counsel's deficient performance. As these errors occurred in different stages of the proceedings and prejudice is related to the outcome of a specific proceeding (trial vs. appeal), the deficiencies cannot cumulate. In any event, even cumulating these errors, appellant has not demonstrated a reasonable probability of a different outcome given the overwhelming evidence of guilt.

ECF No. 26-4 at 6-7.[8]

I have determined that Holman has not shown in grounds I(A) and I(B) that counsel was deficient and that he was prejudiced. So there is no error to cumulate. To the extent that ground I(C) is intended to be a standalone claim, it is denied.

**Ground II—ineffective assistance of appellate counsel**

Holman contends that appellate counsel ineffectively failed to argue that the prosecution improperly impeached Davis Holman's testimony. ECF No. 44 at 12-14. Davis testified on direct examination that he had been convicted of robbery and was in custody on a probation violation. ECF No. 22-1 at 82-83. When the prosecutor started to ask Davis why he was in custody, the defense objected. *Id*. at 102-103. The court allowed the question. So the prosecution then asked Davis if the allegation for the violation was that he was hanging out with

---

[8] The one instance the court references here is the impeachment that is the subject of ground II, Holman's ineffective assistance of appellate counsel claim.

a gang, and Davis said that it was not. *Id*. at 104-105.  The prosecution returned to asking Davis details about the barbecue and timing.

Federal habeas corpus does not lie to review questions about the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  Federal courts may not interfere with a state evidentiary ruling; they may only consider whether the evidence was so prejudicial that its admission violated fundamental due process and the right to a fair trial. *Id*. at 67-68.  Even if erroneous, a state evidentiary ruling is not grounds for federal habeas relief unless it is so fundamentally unfair as to violate due process. *See Dillard v. Roe*, 244 F.3d 758, 766 (9th Cir. 2001); *see also Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (stating the federal court's "role is limited to determining whether the admission of evidence rendered the trial so fundamentally unfair as to violate due process.").

Nevada law "permits impeaching a witness on cross-examination with questions about specific acts as long as the impeachment pertains to truthfulness or untruthfulness. *Butler v. State*, 102 P.3d 71, 79 (Nev. 2004).  Moreover, appellate counsel need not raise every nonfrivolous issue; indeed, attorneys regularly choose to raise only the stronger arguments on appeal. *See, e.g., Jones v. Barnes*, 463 U.S. 745 (1983).

Margolis testified at the state postconviction hearing that defense counsel recognized during Davis's testimony that they could have objected to a prosecution question regarding a probation violation. ECF No. 25-5 at 9-11.  He said that counsel discussed whether to object. The court interjected to limit the prosecution's questioning about the probation, and Margolis thought that that rendered any further objection moot.  Margolis helped draft the direct appeal; he did not see this as one of their stronger issues.

The Supreme Court of Nevada rejected this claim:

22

Next, appellant argues appellate counsel should have argued that the State improperly impeached his alibi witness with the underlying facts of a probation violation. During direct examination, the alibi witness acknowledged a robbery conviction and that he was currently in custody on a probation violation. During cross-examination, the prosecutor asked the witness if his probation violation related to a gang association. Defense counsel objected and the district court allowed the prosecutor to ask about the violation. The alibi witness answered no, and the prosecutor asked no further questions. Although it appears that this was improper impeachment, *see* NRS 50.085(3) (allowing impeachment with specific act relating to truthfulness), NRS 50.095 (allowing impeachment with conviction); *Butler v. State*, 120 Nev. 879, 890, 102 P.3d 71, 79 (2004) (recognizing that NRS 50.085(3) "permits impeaching a witness on cross-examination with questions about specific acts as long as the impeachment pertains to truthfulness or untruthfulness" (quoting *Collman v. State*, 116 Nev. 687, 703, 7 P.3d 426, 436 (2000))), appellant has not demonstrated that this issue had a reasonable probability of success on appeal given the overwhelming evidence of guilt presented at trial. Therefore, we conclude that the district court did not err in denying this claim.

ECF No. 26-4 at 5-6.

The prosecution improperly asked Davis one question about the nature of his probation violation. However, the prosecution's overwhelming focus was probing the credibility of Davis's account of the barbecue, including by pressing Davis for details and the names of attendees. Again, given the evidence presented at trial this claim was not one with a reasonable probability of success. Holman has not demonstrated that the Supreme Court of Nevada's conclusion that he did not show that he was prejudiced was contrary to, or involved an unreasonable application of, *Strickland* or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground II.

I therefore deny the petition in its entirety.

////

////

23

**IV.    Certificate of Appealability**

This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing Section 2254 Cases requires me to issue or deny a certificate of appealability (COA).  I have *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*. None of my rulings meets the *Slack* standard, so I decline to issue a certificate of appealability.

I THEREFORE ORDER that the petition **[ECF No. 44] is DENIED**.

I FURTHER ORDER that a certificate of appealability will not issue.

The Clerk of Court is directed to substitute Jeremy Bean for the respondent Calvin Johnson and to enter judgment accordingly and close this case.

DATED this 16th day of February, 2026.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE

24